IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2026

## STATE OF TENNESSEE v. LAQUALA MALONE

**Appeal from the Criminal Court for Shelby County**
No. 23 02488          Paula L. Skahan, Judge

_____

### No. W2025-00853-CCA-R3-CD

_____

The Defendant, Laquala Malone, pled guilty in the Shelby County Criminal Court to one count of aggravated assault. Following a sentencing hearing, the trial court denied the Defendant's application for judicial diversion and imposed a three-year sentence to be served on supervised probation. The Defendant appeals, arguing that the trial court erred by denying her request for judicial diversion. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which KYLE A. HIXSON and MATTHEW J. WILSON, JJ., joined.

Blake Daniel Ballin, Memphis, Tennessee, for the appellant, Laquala Malone.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Marie Ford, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

On June 29, 2023, a Shelby County grand jury returned an indictment charging the Defendant with a single count of aggravated assault in relation to events occurring on December 10, 2022. On May 14, 2025, the Defendant entered an open plea of guilty to the Class C felony of aggravated assault, requesting the trial court to approve judicial diversion.

At the plea submission on May 14, 2025, the State provided a summary of the facts giving rise to the Defendant's charge. According to this summary, on December 10, 2022, the victim, Kennedy Ryan, left the Prohibition Lounge[1] in Shelby County, Tennessee, in a vehicle driven by her cousin after learning that the Defendant wanted to fight with her. Driving a blue Toyota Camry, the Defendant and her sister, Lakyra Malone, followed the victim. Another vehicle bumped the back of the victim's vehicle, and the victim and her cousin stopped their vehicle. The victim exited the vehicle. The Defendant and her sister exited the Camry, approached the victim, and the three began to fight.

The victim advised authorities that the Defendant punched her in the face several times with brass knuckles and that the Defendant's sister also punched the victim and was trying to hold her. The Defendant and her sister left the scene before the police arrived. The State averred that a video of this altercation was available as part of the record, and the State also described photographs of the victim's open cuts and bruises on her forehead, face, and around her eyes.[2] The victim also advised authorities that she took herself to the hospital, where doctors treated her, and she received multiple stitches. The victim gave a statement to authorities at a police station detailing the events described. While at the police station, authorities observed and photographed the victim's bruises and cuts on her face.

The Defendant then stipulated to the facts presented by the State in support of the plea. After receiving the oath, she stated that she graduated from nursing school and that trial counsel had reviewed her rights with her prior to the hearing. The trial court advised the Defendant of her rights and explained the potential consequences of her plea, depending on whether she was granted or denied judicial diversion. Following the discussion of her rights and potential consequences of her plea, the trial court then accepted the Defendant's open plea to aggravated assault. Following her plea, the parties presented witnesses and evidence for the sentencing portion of the hearing, including the Defendant's application for judicial diversion.

Despite her earlier stipulation, the Defendant stated that there were facts submitted by the State in the plea submission with which she did not agree. However, she did not dispute that she badly injured the victim.

---

[1] The record includes references to this business as both the "Prohibition Lounge" and the "Prohibition Club."

[2] While the video was viewed and the photographs were described at the sentencing hearing, they were not made an exhibit at the hearing and are not included in the record on appeal.

The Defendant testified that the events had "[a]ll . . . started over some praying hands [emojis] that [the Defendant] sent to [the victim's] ex-boyfriend." She explained that she and the victim had once been friends. She recalled that at one time, the victim's then-boyfriend had two cousins who passed away in the same timeframe and that he posted on Snapchat that he was going through "a lot" at the time. The Defendant stated that she sent three "praying hand emojis" in response to the message on a Wednesday and did not receive a response until Friday, when her Snapchat started "stead[ily] popping up" on her phone with text messages. She stated that these messages were sent from the victim through her then-boyfriend's account. The Defendant stated that the victim sent messages such as "my man don't need no prayers from you, you weird a** b****." The Defendant testified that the "back and forth" between herself and the victim had begun with this exchange. The Defendant clarified that this occurred near Thanksgiving 2022.

The Defendant testified that on December 10, 2022, her sister's birthday, she took her sister and a friend to the Prohibition Club and dropped them off. She stated she did not go because she "didn't have [her] hair done," but she planned to go with her sister the next day. The Defendant testified that she returned to pick up her sister and her friend at approximately 1:00 a.m. The Defendant stated that she got out of the vehicle to speak with one of her sister's friends and saw her cousin Briana.[3] She stated that she and Briana were no longer friends and that Briana was drunk, coming out of the club with the help of others. The Defendant stated that her sister exited the club after Briana. The Defendant stated that Briana went to her own vehicle, called the victim, and told the victim that the Defendant was outside of the club. The Defendant testified that the victim exited the club shortly after the Defendant's sister. The victim took her boots or shoes off and asked, "[W]hat y'all h*** want to do?" The Defendant stated that at this point, security guards held the victim back and told the Defendant and her sister to get in their vehicle and leave to avoid conflict.

The Defendant testified that she and her sister left the club and turned left onto the road. The victim and the victim's cousin turned right on the road when leaving. The Defendant asserted that the victim's vehicle then made a U-turn and pulled behind the Defendant's vehicle. The Defendant stated that she then pulled into a store's parking lot, and the victim drove past the store. The Defendant testified that Briana then came to the store and got into a short fight with the Defendant's sister. The Defendant stated that after the fight, she and her sister left the store. The Defendant stated that there was no video of her sister's fight with Briana and that the victim was not present when this occurred. The Defendant stated that, as they were leaving, the victim and her cousin "pulled up" in a type of Jeep Grand Cherokee and hit the back of the Defendant's vehicle. The Defendant stated that she exited her vehicle and discovered that the victim's cousin was driving and that the

_____

[3] The record does not contain a surname for the Defendant's cousin; therefore, we will refer to her by her first name. No disrespect is intended.

- 3 -

victim was a passenger in the Grand Cherokee that hit the Defendant's vehicle. The Defendant testified that the victim exited the Grand Cherokee, walked up to the Defendant, and hit the Defendant in the face, starting the fight. She claimed that after the fight was over, the victim and her cousin had a car accident down the street from where they fought, and that the police were called for that unrelated accident.

The Defendant agreed that she became mad after the Grand Cherokee hit her vehicle. She stated that she would not have gotten out of her vehicle if she had known the victim was involved, and that there would never have been an altercation. The Defendant agreed there was a video of at least part of the altercation, which showed her "punching [the victim] repeatedly." The Defendant denied using brass knuckles, claiming she had only been wearing rings. She admitted the victim had injuries to her head and face as a result of the Defendant's repeated blows. She admitted she was wrong for inflicting the injuries on the victim, but again denied using brass knuckles.

The Defendant then apologized to the victim, who was in the courtroom. She stated that she did not "know how [they] ended up here as [they] once [were] friends." The Defendant further stated that she did not intend to injure the victim and that she believed alcohol played a role in the way things occurred that evening, even though she had not been drinking.

When asked about her background, the Defendant stated that she was twenty-three years old, had graduated from Holly Springs High School, and had been sworn into the Mississippi National Guard in 2018, when she was in the eleventh grade. She stated that after completing high school, she completed basic training and then attended nursing school, where she received her LPN certificate in July 2021. She testified that her nursing certificate was revoked due to her criminal charges arising from this incident. She testified that if she received diversion, she could return to nursing school to get recertified. At the time of the hearing, she stated she had been working at Milwaukee Tools for about a year and a half. She testified that she had also worked at Amazon for two to three months, but no longer did. At the time of the hearing, the Defendant had been in the military for seven years in good standing. She testified that she had attended sergeant school but could not be promoted because the pending charges had taken away her security clearance with the military. The Defendant then testified that if she did not receive diversion, she would "be out of the military . . . [and would not] be able to go back to nursing school."

The defense then introduced two character letters on the Defendant's behalf: one from Tavaris Joseph, her cousin and friend, and one from Brian Nelson, who was her Sergeant First Class in the military. Mr. Joseph's letter praised the Defendant's character and background, as well as the community service she had performed. Sergeant Nelson's letter referred to the Defendant's military service as "beyond reproach" and referred to her

as a valuable asset to the military. The State then also introduced the presentence report without objection.

On cross-examination, the Defendant stated she did not file an accident report regarding the Grand Cherokee striking her vehicle because her vehicle was old and not damaged during the incident. She also maintained that the stipulated facts were not correct. The Defendant also stated that because the victim threw the first punch, she had the choice to either allow the victim to "whoop" her or to fight back. She chose to fight back. She agreed the video did not show the victim hitting her first, but she claimed the video did not contain the beginning of the altercation. The Defendant also maintained that she was wearing two rings and no brass knuckles. The Defendant testified that, at the time of the altercation, she had been in the military for four years. She agreed she understood "a lot" about discipline and that she had been taught how to handle herself in certain situations. The video of the altercation was then played twice. The Defendant agreed that the video showed the fighting occurring at the victim's vehicle and that someone in the video said, "brass knuckles." The Defendant also stated that at one point, the victim had stated something about the Defendant having a knife. The Defendant stated that if she received diversion, then she would go back to nursing school and could seek anger management treatment.

In response to the trial court's questions, the Defendant agreed that she had completed boot camp or basic training and had learned how to fight there. The Defendant agreed that it was not a fair fight with a civilian and that she knew that she was not allowed to use military training on a civilian. The Defendant initially maintained that she was "just defending [her]self"; however, in response to the trial court's questions, she agreed that the video showed the victim trying to defend herself. The Defendant also agreed that she had dishonored the military, that the victim did not know better than to go up against someone with military training, that the Defendant did not need brass knuckles to fight the victim, and that the Defendant knew how to protect herself.

The victim, Kennedy Ryan, testified that the December 10, 2022 altercation had changed her mentally and emotionally and that she had been physically injured. She stated that when she went to the hospital following the altercation, the doctor told her she was lucky because if she had been hit one more time, the results would have been much worse. Three ENT doctors treated the victim, and she received twelve or thirteen stitches. The victim recalled that when her two-year-old son was brought to the hospital, the child did not want to touch her or look at her due to her injuries. She testified that she lost an unhealthy amount of weight after the incident and had only recently regained a healthy weight. She stated she had "mentally . . . checked out" and contemplated suicide because the Defendant had been her friend, whom she had "loved" and whom she "still love[d]."

The victim testified that she has severe headaches and must see a "neuro doctor" due to her injuries from the altercation. She also testified that her injuries had left scars.

The victim testified that she and the Defendant had known each other for approximately four years and had previously been good friends. She averred that she knew the Defendant to carry brass knuckles during their friendship. She further testified that the Defendant used these brass knuckles during the altercation. The victim testified that she wanted the Defendant to have a positive outcome. Although she stated that she did not "believe" in incarceration, she supported any sentence the trial court imposed, except diversion.

She stated that the Defendant did not pick up her sister from the club because her sister was in another car. She testified that she was in the club with her friends when the Defendant's sister and her sister's friend were across the room and saw her. The victim did not think anything of this because the sister was smiling, so she believed whatever issue had existed before had ended. When Ms. Ryan was about to leave the club, an officer told her to stay inside because a girl wanted to fight with her outside. Ms. Ryan stated that her friend Briana called and told her the same thing, and stated that they were trying to jump her. When Ms. Ryan and her cousin left, they turned right with her cousin driving. She testified that her cousin made a U-turn by the club and that the Defendant followed her. She testified that the Defendant was part of a group with multiple cars and that the Defendant's vehicle jumped in front of her, and other vehicles were behind her. She testified that the Defendant exited her vehicle and came to the victim's vehicle. Ms. Ryan testified that when she saw the Defendant's weapon, she stopped fighting. She stated that she got back in the car, and the Defendant's sister knocked on the window and told her to go home. She stated that she said one thing while backing up to her car, but that the Defendant and others were still coming towards her. Ms. Ryan stated that not thirty seconds after leaving where the fight occurred, they were hit by another vehicle. She testified that an ambulance came to the second incident, and they had told her that what happened to her face could not have happened on the dashboard. She then explained what had happened in the fight. She described her face as gushing and losing a lot of blood, and how she was becoming lightheaded. She testified that a stranger took off her shirt and gave it to her to put on her face to stop the bleeding.

Ms. Ryan testified that the incident involving the Defendant made her not want to open up to others or let others get close to her. She testified that she had moved out of her apartment and that no one knows where she lives now. She testified that she also has cameras around her house as a result. She also testified that she had never told the Defendant that she wanted to fight and that she would never have touched her.

She testified that prior to this assault happening, the Defendant had tried to come to her friend's house to fight with her. The victim described how she thought this showed the Defendant acted with premeditation in the assault because the Defendant already knew what she was doing before she did it. Ms. Ryan testified that when she referred to the weapon, she meant the brass knuckles, which she had seen and knew the Defendant carried because of their prior friendship.

On cross-examination, Ms. Ryan stated that she did not know whether the Defendant or her sister was celebrating the sister's birthday on the night of the offense, that she did not know how the Defendant's sister got to the club, and that the Defendant had shown up later in the evening when the incident occurred outside the club. Ms. Ryan admitted she had been drinking in the club.

Ms. Ryan testified that she did not want the Defendant to lose her nursing certificate or her position in the military, but she stated that "it's a simple fact you can't do stuff. If she's in the military, how is she able to carry a weapon and not get any consequences?"

The State argued that it opposed diversion, but if the trial court granted diversion, it sought a condition that the Defendant have no contact with the victim. The Defendant argued that she was a good candidate for diversion because she was "not the type of person [to] reoffend" and "was willing to admit her mistakes." She asserted that she had already faced consequences for her actions: she had been arrested and jailed, and she had to hire counsel and appear in court over several years. She also noted that she had lost her nursing license and her military promotion. The Defendant requested a sentence of three years of supervised diversion, including counseling, anger management, no contact with the victim, and maintaining employment. The Defendant argued that "her lack of criminal history, her social standing, [and] the things she has achieved thus far in life" supported granting diversion. She also stated that diversion would allow her to return to nursing and remain in the military, with the opportunity for promotion.

After considering the evidence presented at the hearing, including the presentence report, the video of the offense, the photographs of the victim's injuries, the arguments of counsel, and the nature and characteristics of the criminal conduct involved, the trial court denied the Defendant's request for judicial diversion and imposed a three-year probationary sentence. The trial court also imposed the following conditions as part of the Defendant's probation: that she maintain employment, that she undergo mental health counseling, that she complete anger management within six months, and that she have no contact with the victim. In addition, the trial court permitted the Defendant to reside in Mississippi and transfer her probation supervision there.

In denying the Defendant's request for diversion, the trial court found that the Defendant had no criminal record and was amenable to correction, citing her work history and military background. The trial court further found that the Defendant's social history and physical health both appeared to be "pretty good." The trial court noted that it was unaware of the Defendant's mental health, but it found that the Defendant appeared to have some anger issues. However, the trial court further found that the circumstances of the offense were "very horrible" and weighed against a grant of diversion. The trial court found a need for deterrence to the Defendant as well as to others, specifically all those present during the altercation. The trial court found that judicial diversion would certainly serve the Defendant's interests, citing her LPN certification and her loss of opportunities for promotion within the National Guard. The trial court noted that it was unclear whether its denial of diversion would force her to lose her position in the National Guard entirely. In summary, the trial court found that "the severity of this beating, weighing everything, especially the circumstances of the offense and the injuries, both physical[ly]; medically; and emotionally suffered by [the victim], weighing everything, diversion is denied."

This timely appeal followed.

## II. ANALYSIS

On appeal, the Defendant argues that the trial court abused its discretion by denying her request for judicial diversion, claiming that there was no substantial evidence to support the trial court's use of the Defendant's "military training" as part of the circumstances of the offense. The State argues that the trial court appropriately denied the Defendant's request for judicial diversion.

In order to qualify for a grant of judicial diversion, a criminal defendant (1) must plead guilty to or be found guilty of a misdemeanor or a Class C, D, or E felony; (2) must not be seeking diversion for a sexual offense enumerated in Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(e) or a Class A or B felony; and (3) must not have a prior conviction for a felony or a Class A misdemeanor. Tenn. Code Ann. § 40-35-313(a)(1)(B)(i). When a trial court grants a defendant's application for diversion, the defendant's "plea or verdict is held in abeyance and further proceedings are deferred under reasonable conditions during a probationary period established by the trial court." *Rodriguez v. State*, 437 S.W.3d 450, 455 (Tenn. 2014) (citing Tenn. Code Ann. § 40-35-313(a)(1)(A)).

A grant of diversion is not mandatory upon a defendant's qualification under the statute. *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014). Instead, Tennessee Code Annotated section 40-35-313(a)(1)(A) vests the trial court with discretion to grant or deny

a qualifying defendant's request for diversion. *Id*. In determining whether to grant or deny diversion, the trial court must consider

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (first citing *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); and then citing *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)). The trial court must also weigh each of these factors and place an explanation for its ruling on the record in support of its decision. *King*, 432 S.W.3d at 326. Though the trial court need not recite all the factors on the record, the record nevertheless must indicate that the trial court considered each factor and "identified the specific factors applicable to the case before it." *Id*. at 327.

Judicial diversion is not a sentence; rather, a "grant or denial of judicial diversion is a *decision* to either defer or impose a sentence." *Id*. at 324-25 (emphasis in original). Given this close relation to sentencing, the appropriate standard of review for a trial court's grant or denial of diversion is for an abuse of discretion as announced in *State v. Bise*. *King*, 432 S.W.3d at 325; *see also State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (holding that sentencing decisions imposed within the appropriate statutory range are reviewed on appeal for an abuse of discretion). Further, so long as the trial court considers the *Parker* and *Electroplating* factors, weighs them against each other, and places its findings on the record, we will presume that its decision is reasonable and will "uphold the grant or denial [of diversion] so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 326-27. "Substantial evidence" is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." *Evidence*, Black's Law Dictionary (12th ed. 2024) ("substantial evidence" defined within); *see State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting Black's Law Dictionary). However, when the trial court fails to consider the *Parker* and *Electroplating* factors or place its findings on the record, we will either review its decision *de novo* or, if more appropriate under the circumstances, remand the issue to the trial court for reconsideration. *King*, 432 S.W.3d at 328.

In its ruling, the trial court found that the Defendant's amenability to correction, criminal record, social history, and physical health favored consideration of judicial diversion; however, it found that other factors did not support diversion. The trial court found that while there was no evidence of the Defendant's overall mental health, there was

evidence that the Defendant had some anger issues. The trial court also found a need for deterrence, both for the Defendant and for others. The trial court found that the factor which weighed most heavily in its analysis was the circumstances of the offense, which weighed against diversion. Because the record indicates that the trial court considered and weighed the *Parker* and *Electroplating* factors and set forth its findings on the record, we will accord its decision the presumption of reasonableness. *Id*.

The Defendant argues that there was no substantial evidence to support the trial court's finding that she used her military training to inflict the victim's injuries. The record does not support that argument. In weighing the *Parker* and *Electroplating* factors, the trial court found that the circumstances of the offense were "very bad" and "very, very horrible," and that the Defendant, "with her military training," "got involved" in a dispute between the victim and the Defendant's sister. During a colloquy between the Defendant and the trial court, the Defendant was questioned about her military training and its use during the altercation. The Defendant agreed that her military training made the altercation an unfair fight and that she dishonored the military by using such training on a civilian. Although the Defendant initially claimed she was only defending herself, she later agreed that the video demonstrated the victim defending herself. The Defendant's own admissions support the trial court's consideration of her military training as part of the circumstances of the offense. *See, e.g.*, *State v. McCracken*, No. E2008-00361-CCA-R3-CD, 2008 WL 5330462 at *3 (Tenn. Crim. App. Dec. 22, 2008) (trial court relied upon defendant's admissions in presentence report in denial of judicial diversion), *no perm. app. filed*. Thus, there was substantial evidence to support the trial court's finding.

The trial court also considered the video recording of the altercation and the photographs of the victim's injuries in its findings concerning the horrific circumstances of the offense. However, the video and the photographs are not part of the appellate record. The appellant bears the obligation of preparing a complete and adequate record. *See* Tenn. R. App. P. 24(b). The video is directly relevant to the Defendant's claim that the trial court erred in its denial of her application for judicial diversion, as its contents were relied upon by the trial court in its findings concerning the circumstances of the offense and the Defendant's use of military training in the offense as part of those circumstances. In the absence of the video and the photographs, we must presume the findings of the trial court are correct. *Fifer v. State*, No. W2024-01377-CCA-R3-PC, 2025 WL 1753576, at *6 (Tenn. Crim. App. June 25, 2025) (citing *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991)). Because the record includes substantial evidence supporting the trial court's findings and denial of judicial diversion, we conclude the court did not abuse its discretion. The Defendant is not entitled to relief.

### III.    CONCLUSION

Following our review of the record and based on the foregoing analysis, we affirm the judgment of the trial court.

s/ *STEVEN W. SWORD*

STEVEN W. SWORD, JUDGE